No. 72,257

STATE OF KANSAS, *Appellee*, v. ABRAHAM ORR, *Appellant*.
(940 P.2d 42)

Opinion filed May 30, 1997.

*Jessica R. Kunen*, chief appellate defender, argued the cause, and *Rebecca E. Woodman*, assistant appellate defender, was with her on the briefs for appellant.

*John F. Wilcox, Jr.*, assistant district attorney, argued the cause, and *Debra Westhoff*, student intern, *Christine K. Tonkovich*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Abraham Orr appeals from his convictions of first-degree murder, K.S.A. 21-3401, and attempted aggravated robbery, K.S.A. 21-3427 and K.S.A. 21-3301. He claims ineffective assistance of counsel in violation of his Sixth Amendment right under the United States Constitution. He also challenges the admission of his confession and contends that the evidence fails to support the jury's determination that he was legally sane at the time of the crime.

On September 18, 1993, the defendant and three friends, James Wadley, Courtney Crockett, and Adrian Perkins, traveled in Wadley's car to Kansas City from their home in Topeka. The defendant was 1 month shy of his 18th birthday. On the return trip, Wadley's car broke down on the Kansas turnpike near one of the Lawrence toll exits. The four left the car on foot to look for a telephone.

The defendant and Wadley entered a convenience store near the turnpike to make the telephone call. Once inside, they decided to steal an unguarded purse, hoping to find car keys. The keys in the purse did not fit the car in the parking lot outside the store, so the youths walked on. The four encountered an Izuzu Trooper parked with its motor running at the gate of a park not too far from the convenience store. Initially, they passed the vehicle but soon returned to steal it.

The occupants of the vehicle included, Edward Lees, Dana Chang and Dana's 2½-year-old son and her 15-month-old daughter. The defendant and Crockett approached the vehicle, while Perkins and Wadley hung back. The defendant carried his own handgun, while Crockett carried Wadley's 9 mm. pistol. They motioned to Lees to get out of the vehicle. Lees shook his head no and then faced forward.

This action frustrated the defendant. He took out his gun and tapped on the vehicle window. When Lees refused to move, the defendant shot a warning shot at the ground. Again, Lees did not move but shifted into reverse and slowly moved backward. The defendant, in anger, raised his gun and shot through the window.

Chang witnessed each of these events and testified that the bullet went through Lees' head. The vehicle rolled back into a ditch.

She grabbed her son and ran for help. Chang flagged down a car whose driver agreed to watch her son as she returned for her daughter. Another driver whom Chang alerted went to the toll booth to report the incident to the police. While he was in the process of calling, he witnessed four youths running from the woods to the toll booth. He reported the youths as possible suspects. Lees bled to death at the scene from a bullet wound to his neck.

Police arrived at the east Lawrence toll booth and arrested the four young men. They were all taken to the Douglas County Law Enforcement Center. During separate interrogations, each suspect confessed to their involvement in the shooting. The defendant was the last to confess, only agreeing to talk after he saw the other three youths. The defendant was charged with felony murder and attempted aggravated robbery. A motion to suppress his confession was denied prior to trial. Based upon his juvenile record, the defendant was tried as an adult.

At trial, Chang identified the defendant as the shooter. The defendant's confession was admitted through the interrogating officer. The defendant raised the defenses of insanity and diminished capacity. He testified on his own behalf regarding his state of mind during the incident. He explained that he thought he was doing the right thing to get his friends a car to get home. He also testified that his brother had died a month before the shooting, causing him severe depression.

A teacher of the defendant's and a school social worker testified to the change in personality they had witnessed in the defendant since the date of his brother's death. In addition, his mother testified that her sons had been very close and the death had severely affected the defendant.

As a rebuttal witness, the State called the court-appointed psychiatrist, Dr. Sheldon Vile, of the Bert Nash Mental Health Center. Dr. Vile testified that he examined the defendant a few months after the crime and determined that while the defendant exhibited some signs of depression, he believed the defendant to be legally sane on the date of the crime. The defendant's appeal was timely filed; his counsel requested that the case be remanded for a de-

termination of the defendant's contention that he had not been adequately represented during the trial of his case.

In *State v. Van Cleave*, 239 Kan. 117, Syl. ¶ 1, 716 P.2d 580 (1986), we held that a claim of ineffective assistance of counsel will not be considered for the first time on appeal. We outlined in *Van Cleave* a remand procedure for hearing a claim of ineffective assistance of counsel before the trial court. The rationale for this procedure was clearly stated in *Van Cleave*:

"The principal problem facing an appellate court when a claim of ineffective assistance of counsel is raised for the first time on appeal is that the trial court, which observed counsel's performance and was aware of the trial strategy involved, is in a much better position to consider counsel's competence than an appellate court is in reviewing the issue for the first time from a cold record. Many times what would appear in the record as an indication of ineffective counsel was fully justified under the circumstances present in the trial court. The trial judge should be the first to make a determination of such an issue and our refusal to consider the matter for the first time on appeal is sound." 239 Kan. at 119.

In this case, pursuant to counsel's request, we used the procedure for remand outlined in *Van Cleave*; we retained jurisdiction over the defendant's appeal, but remanded for a full consideration of his ineffective assistance of counsel claim. The trial judge presiding over the defendant's trial had retired and was not available to hear the claim of ineffective assistance upon remand. District Court Judge Jack A. Murphy of the same judicial district heard the case upon remand. Three separate hearings were held. The hearings were extensive. Judge Murphy recognized that the case would normally be heard by the judge who tried the criminal case. As a result, "the Court [upon remand] granted the Defendant and the State greater leeway and time than might usually be necessary to present evidence and arguments."

The parties were given additional time to submit memoranda of law, which each party submitted to the court. Numerous witnesses, including the defendant and his trial counsel, testified. The trial court considered all evidence presented and the authority submitted by the parties and addressed the four issues raised by the defendant. In a 16-page memorandum decision, the court concluded that "this was a difficult case to defend. Trial counsel provided

reasonably effective assistance in the case, considering all of the circumstances and the evidence from his perspective at the time of defending Mr. Orr."

## EFFECTIVENESS OF COUNSEL UNDER THE SIXTH AMENDMENT

### Standard of review

Recently we set forth the standard of review we apply in cases where it is alleged that the defendant has been denied the effective assistance of counsel under the Sixth Amendment. In *State v. Rice*, 261 Kan. 567, 598-603, 932 P.2d 981 (1997), we said:

"The two landmark cases on the issue of ineffective assistance of counsel are those considered and utilized by the trial court, *Strickland* [*v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984),] and *Chamberlain* [*v. State*, 236 Kan. 650, 694 P.2d 468 (1985)].

"Justice O'Connor, in writing for a 7 to 2 majority in *Strickland*, stated that before counsel's assistance is determined to be so defective as to require reversal, two components or prongs must be shown:

'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial . . . .' 466 U.S. at 687.

"Further, the *Strickland* majority opinion states:

'[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

'Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133-134 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circum-

stances, the challenged action "might be considered sound trial strategy." See *Michel v. Louisiana, supra,* at 101. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. Rev. 299, 343 (1983).

'The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

'Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' 466 U.S. at 689-90.

"*Strickland* was a federal habeas challenge to a state criminal court determination. In viewing the Court's scope of review, Justice O'Connor concluded:

'Finally, in a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d). Ineffectiveness is not a question of "basic, primary, or historical fac[t]." *Townsend v. Sain,* 372 U.S. 293, 309, n.6 (1963). Rather, like the question whether multiple representation in a particular case gave rise to a conflict of interest, it is a mixed question of law and fact. See *Cuyler v. Sullivan,* 446 U.S., at 342. Although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254(d), and although district court findings are subject to the clearly erroneous standard of Federal Rule of Civil Procedure 52(a), both the performance and prejudice

components of the ineffectiveness inquiry are mixed questions of law and fact.' 466 U.S. at 698.

"Although the clear direction of *Strickland* that 'both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact' did not find its way into *Chamberlain,* our seminal Kansas case on this issue, the heart and purpose of the *Strickland* ruling did, and it has been uniformly applied to every Kansas ineffective assistance of counsel case since it was filed in 1985.

"In writing for the Kansas Supreme Court in *Chamberlain,* Justice Holmes set forth the existing Kansas standards of *Schoonover v. State,* 2 Kan. App. 2d 481, Syl. ¶¶ 2, 3, 4, 582 P.2d 292, *rev. denied* 225 Kan. 845 (1978), and the claim of 'actual ineffectiveness' of *Strickland.* Justice Holmes then stated:

'Comparing *Strickland v. Washington* with the *Schoonover v. State* standards of ineffective assistance of counsel reveals little conflict between the two. Where *Schoonover* required proof of counsel's conduct substantially deviating from that expected of a reasonably competent lawyer in the community, *Washington* requires proof the conduct was not reasonable considering all the circumstances, with defendant required to overcome a strong presumption of reasonableness. *Schoonover* also required proof counsel's conduct caused the client's conviction or otherwise worked to the client's "substantial disadvantage." *Washington* now requires a defendant establish a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. While the actual application of the standards from *Schoonover* as opposed to those of *Washington* would in all probability effect the same result in any given case, we deem it appropriate to now adopt the *Washington* holdings as the prevailing yardstick to be used in measuring the effectiveness of counsel under the Sixth Amendment. They may be stated as:

*First.* The Sixth Amendment right to counsel is the right to the effective assistance of counsel, and the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

*Second:* A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.

(a) The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every

effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.

In adopting the *Washington* two-pronged standard or test we do not abandon the standards which have been carefully developed in *Schoonover* and its progeny. While the Supreme Court in *Washington* refrained from adopting any "mechanical rules" to be utilized in considering a claim of ineffective assistance of counsel we are of the opinion that our standards enunciated in *Schoonover* and built upon in subsequent cases remain viable guidelines in the application of the *Washington* standard.' *Chamberlain*, 236 Kan. at 656-57.

"In addition, *Chamberlain* requires the trial court to assess the performance of counsel before an appellate court considers the matter and stated: 'Much deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all of the proceedings first hand as they happened.' 236 Kan. at 659-60.

"It is apparent from an examination of our appellate decisions on ineffective assistance of counsel issues that Kansas courts have uniformly followed the mandates of *Schoonover, Strickland*, and *Chamberlain* in applying the two-pronged test of *Strickland*, making the independent evaluation of each situation by the totality of the representation as directed in *Schoonover*, requiring the assessment of the performance of counsel by the trial court before it will be considered by the appellate court, and then allowing 'deference and reliance . . . upon the wisdom and determination of the trial judge who saw all the proceedings firsthand as they happened' as directed by *Chamberlain*. Although we may not have uniformly stated in our appellate opinions that we have, given a de novo review to the mixed questions of fact and law which exist, it is apparent that we have done so.

"We hold that once a proper determination of the issue of ineffective assistance of counsel has been made by the trial court, see *State v. Miller*, 259 Kan. 478, 486-87, 912 P.2d 722 (1996); *State v. Hall*, 246 Kan. 728, 753, 793 P.2d 737 (1990); and *State v. Van Cleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986), we review the issue on appeal de novo as directed by *Strickland* as mixed questions of fact and law under the totality of the facts and circumstances. Our isolated statement in *Taylor*, 251 Kan. at 285, that the appropriate scope of review is abuse of discretion, is disapproved.

"Such a holding is consistent with the myriad of cases from the 10th Circuit Court of Appeals which have uniformly so held. See, *e.g., Nickel v. Hannigan*, 97 F.3d 403, 408 (10th Cir. 1996) ('This court reviews de novo the district court's ineffective assistance of counsel analysis, which involves mixed questions of law and of fact.'); *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) ('The performance and prejudice components of the *Strickland* analysis present mixed questions of law and fact which we review de novo.'); *Brecheen v. Reynolds*, 41 F.3d 1343, 1365-66 (10th Cir. 1994) (' "[T]he performance and prejudice prongs under *Strickland* involve mixed questions of law and fact which we review de novo." ') (quoting *United States v. Owens*, 882 F.2d 1493, 1501-02 n.16 [10th Cir. 1989], which cited *Strickland*, 466 U.S. at 698)."

Our review in the case is then de novo on mixed questions of law and fact. However, we do not ignore the findings of the trial court. In this case, as in most cases where the procedure outlined in *Van Cleave* is employed, the trial court decides the same question we are called upon to review. In this case, the trial court granted both parties considerable latitude in developing the evidence regarding the issue of ineffective assistance of counsel. The factual determinations made by the trial court under these circumstances are, if supported by substantial competent evidence, entitled to great weight before this court. "Much deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all of the proceedings first hand as they happened." *Chamberlain v. State*, 236 Kan. 650, 659-60, 694 P.2d 468 (1985).

We recognize that the findings of the district court are not binding upon this court when reviewing the question of ineffective assistance of counsel in a criminal trial. In both state and federal proceedings, this is true. However, as Justice O'Connor points out in *Strickland*, deference is accorded to the trial court's findings of fact in the federal system. State court findings of fact, made in the course of deciding an ineffectiveness claim, are subject to the deference requirement of 28 U.S.C. § 2254(d) (1995). The written finding, written opinion, or other reliable and adequate written indicia of the state court "shall be presumed to be correct," unless the applicant establishes certain facts, most of which deal with a denial of due process at the state court proceeding. 28 U.S.C. § 2254(d).

At the same time, when a federal appellate court deals with findings of a federal district court, again involving a question of ineffective assistance of counsel on appeal, Federal Rule of Civil Procedure 52(a) provides that the "[f]indings of fact, whether based on oral or documentary evidence, *shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.*" (Emphasis added.)

Not unlike the federal system, in Kansas, where the trial court has made findings of fact and conclusions of law, we are in a position to determine whether the decision reached by the trial court follows as a matter of law from the facts stated as its basis, and also whether the facts so stated have any substantial support in the evidence. *Taylor v. State*, 252 Kan. 98, Syl. ¶ 2, 843 P.2d 682 (1992). We do not reweigh the testimony or pass on the credibility of witnesses. *McKissick v. Frye*, 255 Kan. 566, Syl. ¶ 8, 876 P.2d 1371 (1994); *Taylor*, 252 Kan. at 104. In our review, we accept as true the evidence and all inferences to be drawn therefrom to support the findings of the trial court and disregard any conflicting evidence or other inferences that might be drawn therefrom. *State v. Rowell*, 256 Kan. 200, 213, 883 P.2d 1184 (1994); *State v. Ratley*, 253 Kan. 394, 398, 855 P.2d 943 (1993); *State v. McKeown*, 249 Kan. 506, 515, 819 P.2d 644 (1991). At the same time, both the performance and prejudice components of the ineffectiveness inquiry remain mixed questions of law and fact. *Strickland v. Washington*, 466 U.S. 668, 698, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

With the above standard clearly in mind, we review and determine the issue regarding the defendant's contention that his counsel was ineffective. The defendant sets forth eight specific allegations of ineffective assistance of counsel. We examine each allegation.

1. *Allegations that counsel failed to thoroughly investigate and present the defenses of insanity and diminished capacity.*

The defendant argues that his trial counsel's failure to fully investigate his defenses was unreasonable conduct and that this conduct prejudiced the outcome of the trial. The defendant relies pri-

marily on cases from other jurisdictions to support his argument. While these cases present some factual similarity to the defendant's case, the cases relied on by the defendant also vary substantially from the facts in this case. The question posed is fact-driven. All cases cited by the defendant depend upon the available facts and application of the two-pronged test set forth in *Strickland* or a comparable legal rule. Each case is decided on its own unique facts. We, therefore, proceed to the facts of the present case.

It is undisputed that trial counsel investigated the defenses of insanity and diminished capacity. The issue before this court is whether the extent of the investigation meets a minimum standard of reasonableness. If not, this court must determine whether a lack of thorough investigation prejudiced the outcome of the trial.

At the several remand hearings, trial counsel's investigation of the defendant's psychological background was thoroughly explored. Trial counsel filed a notice of insanity with the trial court after determining that insanity was the strongest defense available to the defendant. Soon after, trial counsel filed an amended notice of insanity, which included the defense of diminished capacity. The court ordered a psychiatric evaluation. Dr. Eugene Vile of the Bert Nash Mental Health Center evaluated the defendant and reported that in his opinion the defendant had been legally sane at the time of the crime.

After receiving Dr. Vile's evaluation, trial counsel requested an ex parte order from the district court for funds to hire a defense expert on the issue of insanity. After consulting with Ron Wurtz, the Shawnee County Public Defender who recommended Dr. Stephen Peterson, a forensic psychiatrist, trial counsel sought a second evaluation from Dr. Peterson. Dr. Peterson requested certain records relating to the defendant's background. Trial counsel supplied Dr. Peterson with some but not all of the records. Trial counsel wrote a letter notifying Dr. Peterson that he was in the process of obtaining the rest of the records.

Dr. Peterson interviewed the defendant for over 4 hours at the county jail. Following the interview, Dr. Peterson, like Dr. Vile, concluded that the defendant was sane. Upon hearing Dr. Peterson's conclusion, trial counsel told Dr. Peterson that he did not

need to write a written report memorializing his findings. Trial counsel testified that Dr. Peterson said he did not need to look at any other records and that Dr. Peterson told him there was absolutely no evidence of insanity or diminished capacity.

Trial counsel testified that he investigated the names of counselors that the defendant provided him. He received records from the Youth Center at Topeka (YCAT) and spoke several times to a counselor there. He spoke with the defendant's teachers at Topeka High School. He requested information from the defendant's parents regarding the defendant's claim of Supplemental Security Income. Trial counsel did not contact Stormont-Vail Regional Medical Center where the defendant had been admitted for a period of time at age 13.

At one of the remand hearings, Dr. Peterson confirmed his request for various records regarding the defendant's upbringing and life experiences in order to thoroughly evaluate the defendant. Dr. Peterson stated that he only received part of the defendant's YCAT file and the Douglas County Law Enforcement investigation records prior to his interview with the defendant.

The doctor's testimony focused on the records he *did not* receive, including the Stormont-Vail records as well as school records. He testified to the importance of those records for a thorough evaluation. Dr. Peterson agreed that he told trial counsel that he did not find strong evidence in support of an insanity defense. However, he stated that he informed trial counsel that his conclusion was limited by the information he received.

Dr. Peterson was finally supplied the defendant's records from Stormont-Vail prior to the remand hearing. He testified that this information would have prompted him to do further testing on the defendant. He testified that there was a reasonable probability that relevant evidence addressing the issue of diminished capacity could have been revealed from additional testing. On cross-examination, Dr. Peterson stated that his review of the hospital records had not affected his opinion that the defendant was sane at the time of the murder. However, he testified that results from further testing would have gone to the defense of diminished capacity.

Following Dr. Peterson's testimony, the defendant called Dr. Robert Schulman to testify. Dr. Schulman was qualified to testify because he had evaluated the defendant at Stormont-Vail 5 years prior to the crime and had reevaluated the defendant prior to the remand hearing. The second evaluation was made a full 2 years after the commission of the crime. He diagnosed the defendant as suffering from post-traumatic stress disorder (PTSD) stemming from the death of his brother. His ultimate conclusion was that because the defendant had PTSD, he could not have formed the requisite intent for the attempted robbery.

Dr. Schulman testified that after giving the defendant a standard clinical psychological examination, consisting of numerous tests, a neuropsychological screening, and a record review, he found the defendant to be a different person from the one he examined at Stormont-Vail. Dr. Schulman found that the defendant was cooperative and pleasant and that he was able to interact in a positive way and was not aloof, and that the defendant provided the kind of information needed to perform a reliable and valid examination. Moreover, the defendant's IQ was found to be much higher in the present examination, to a point that it argued against the question of dementia, although not completely according to Dr. Schulman. Finally, Dr. Schulman testified that the defendant was able to conceptualize and that his cognitive functioning was better than it had been in 1989. He stated that it was "difficult to conclude one way or another with regard to the dementia issues" and, thus, he did not make a finding of dementia, which was defined as a difficulty with the brain or an organic brain syndrome.

The defendant testified that he had notified his attorney that he spent time at Stormont-Vail and that he had received a brain scan at that time. He also told his attorney that he had applied for SSI. The defendant claimed that when he asked his attorney whether he had contacted certain counselors, trial counsel did not respond. The defendant believed his attorney had not talked to several people the defendant had mentioned. On cross-examination, the defendant gave conflicting testimony and stated that there was no person he told his attorney about who was not contacted.

At the time defense counsel made his decision to rely upon the records he had acquired, the psychiatrist he retained had conducted a 4-hour interview with his client in the county jail. Immediately following this interview, Dr. Peterson met with defense counsel, indicating that he had no need for additional records and stating, "[I]t's not even close as far as the insanity defense or diminished capacity." Trial counsel explained that he chose to call lay witnesses to testify to the defendant's change in behavior following the death of the defendant's brother because he lacked an expert witness. These witnesses included the defendant's mother, Irene Orr, his high school teacher, Rose Rodriguez, and a school social worker, Katherine Kent. Trial counsel also requested a jury instruction on diminished capacity, and his request was granted.

There was a direct conflict between the testimony of trial counsel and Dr. Peterson. Trial counsel stated that Dr. Peterson did not want any more records than he had already seen and that he relied on Dr. Peterson's expert opinion that further records were of no use. Dr. Peterson's testimony directly contradicted trial counsel's statements. In addressing this conflict, the trial court quoted directly from trial counsel's testimony and further stated:

"Prior to considering whether any deficient performance by trial counsel prejudiced the Defendant, the Court must first determine if, in fact, the performance of the attorney was deficient in failing to provide all of the records originally requested by Dr. Peterson. The Court finds that his performance was not deficient. He had obtained some of the requested records and was in the process of acquiring the balance. Dr. Peterson elected to proceed with the 4-hour-evaluation of the Defendant. Dr. Peterson had the Court-ordered evaluation from Bert Nash Mental Health Center as prepared by Dr. Vile, a psychiatrist, the YCAT records, and the Douglas County Law Enforcement investigation records. After reviewing the records and then conducting the 4-hour-examination, Dr. Peterson told [defense counsel] that 'it's not even close as far as the insanity defense or diminished capacity.'

"Although there is some conflict between [defense counsel's] and Dr. Peterson's testimony, the Court finds that Dr. Peterson declined to have [defense counsel] obtain any of the other records Dr. Peterson had first requested."

In so concluding, the trial court set forth the following quote from *Strickland*, 466 U.S. 668:

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

Further, the trial court rejected testimony of Dr. Schulman due to the fact that his evaluation of the defendant occurred more than 2 years after the crime was committed.

Based upon the findings of fact made by the trial court, which are supported by substantial competent evidence, we agree with the trial court that trial counsel under all the circumstances made a reasonable investigation of the defenses of insanity and diminished capacity.

The findings of fact are supported by the evidence on record, and while the evidence may support a different conclusion, we recognize that the trial court was present at the hearing, had the opportunity to view the witnesses testifying, had the ability to weigh the credibility of the witnesses, and made its determination of fact based upon being present. We, on the other hand, were not present but must read the cold record. We are not in a position to weigh the testimony, nor are we in a position to resolve conflicts in the testimony, especially where, as here, there is substantial evidence of record supporting the findings of the trial court. Based upon the findings of fact in this case, we are able to conclude that trial defense counsel met the performance component of an ineffectiveness inquiry. It is, therefore, unnecessary for us to test for the prejudice component of the ineffectiveness inquiry.

Counsel for the defendant states that it is apparent that Dr. Peterson was not provided the necessary information to conduct a competent examination of the defendant. This contention is not supported by the record before this court. Dr. Peterson did not want or need additional records. At this point, trial counsel had a report from Dr. Vile indicating that his client's insanity defense was not viable and an oral report after extensive examination by Dr. Peterson stating, "[I]t's not even close as far as the insanity defense or diminished capacity."

The defendant contends that the trial court's finding that Dr. Peterson did not want the additional reports was clearly erroneous because trial counsel simply was not credible on the issue. The defendant relies upon the statements of several witnesses, all of whom the defendant claims contradict trial counsel. However, upon closer examination, the defendant's contentions are without merit.

The defendant points to the testimony of Dr. Peterson. However, we did not view the testimony of Dr. Peterson or trial counsel, nor are we in a position to judge the credibility of the two witnesses. The trial court did and was. This contradiction runs in favor of the trial court's resolution and provides no support for the assertion that trial counsel is not telling the truth. In addition to the conflicting testimony of Dr. Peterson and trial counsel, the defendant states that the testimony of Kay Huff concerning trial counsel's failure to sufficiently meet with his client and review his testimony 2 months prior to trial undermines trial counsel's claim that Dr. Peterson did not want additional records. This issue was resolved by the court based upon all the circumstances. As the trial court noted: "The testimony of Kay Huff to the effect that trial counsel had not spent much time with the Defendant immediately prior to trial did not in any way indicate that prior attorney-client contacts were inadequate." Moreover, Huff offered no testimony concerning Dr. Peterson. Under these circumstances, Huff's testimony provides no support for the defendant's contention.

The defendant also asserts that the testimony of Ron Wurtz on the need to spend extra time with the defendant because of his low intellectual ability and difficulty understanding concepts undermines the credibility of trial counsel. However, it must be recognized that this is an opinion offered by Wurtz. The opinion involves a judgment call and has no bearing upon the credibility of trial counsel. If Dr. Schulman's testimony concerning the mental condition of the defendant is to be believed, the defendant does not have low intellectual ability and has little difficulty understanding concepts.

Finally, the defendant relies upon his own testimony, contending that such testimony undermines his trial counsel's statements on

the issue of whether Dr. Peterson requested additional records. Assessing credibility between the defendant and trial counsel was uniquely within the province of the trial court. The defendant's testimony provides no basis for concluding that the finding that Dr. Peterson requested no additional records is clearly erroneous.

2. *Allegations that counsel failed to thoroughly investigate the defendant's background prior to arguing the defendant's motion to suppress his confession.*

Just as in the first allegation of ineffectiveness, the defendant argues that trial counsel's failure to investigate, or secure all past records relating to the mental condition of the defendant, including the records from Stormont-Vail Hospital, and the failure of counsel to present such evidence in support of his claim that the defendant's statement was involuntary, amounted to ineffective assistance. We disagree and conclude that the actions of trial counsel fall within the wide range of reasonable professional assistance.

Trial counsel filed a motion to suppress his client's confession. The circumstances surrounding the defendant's confession are more fully discussed below in the claim that the trial court erroneously failed to suppress the defendant's confession. Trial counsel vigorously represented his client in the suppression hearing.

Prior to filing a motion to suppress, trial counsel had the written report of the court-appointed psychiatrist, Dr. Vile, concerning the mental condition of his client. In addition, trial counsel had the oral report of Dr. Peterson indicating that "it's not even close as far as the insanity defense or diminished capacity."

While the issue of whether a defendant's statement is voluntary is dependent upon the mental capacity of the defendant, *State v. Mack*, 255 Kan. 21, 32, 871 P.2d 1265 (1994); *State v. Young*, 220 Kan. 541, 547, 522 P.2d 905 (1976), the ultimate determination is based upon the totality of the circumstances, including (1) the manner and duration of the questioning; (2) the suspect's ability upon request to communicate with the outside world; (3) the suspect's intellect, age, and background; and (4) the fairness of the interrogating officers. *State v. Lumbrera*, 257 Kan. 144, 160-61, 891 P.2d 1096 (1995). Trial counsel explored all of the above factors during

the suppression hearing. Given the psychiatrist's reports that he had, and the fact that he had gathered most of the defendant's past medical history, it was not unreasonable that trial counsel would concentrate upon each of the above issues relating to voluntariness in advancing his client's motion to suppress.

We have concluded that the actions of counsel, in his investigation of the defendant's sanity at trial, falls within the wide range of reasonable professional assistance. This conclusion supports our determination that under the totality of circumstances, trial counsel's investigation and representation at the suppression hearing also falls within the wide range of reasonable professional assistance.

3. *Allegations regarding counsel's decision to waive an opening statement.*

The defendant argues that trial counsel's failure to give an opening statement to explain the theory of defense was ineffective assistance of counsel. The defendant states that the theory was confusing and difficult for the jury to understand.

Upon remand, the trial court, in addressing this issue, concluded: "Whether or not to make an opening statement is a tactical decision of the trial attorney. Absent a showing of prejudice to the Defendant, the Court should not engage in second guessing the trial attorney's strategy."

The trial court cited *Strickland* for the following proposition:

"[A] Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation omitted.] . . . Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.

It is possible that the decision of trial counsel to waive opening statement was a tactical decision. It does not appear that at that time a final decision had been made as to whether the defendant would testify at trial. The insertion of the word "willful" was still present in the information filed against the defendant. The latter point will be discussed further below; both of these factors suggest

that counsel's decision may have been tactical. However, the evidence of record is inconclusive. If we assume that counsel's action in failing to make an opening statement, fell below that range of reasonable professional assistance required by the Sixth Amendment, we are still left with the second prong of *Strickland*.

The question becomes whether "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Chamberlain*, 236 Kan. at 657. We conclude that the answer to this question is no. The actions of the defendant as recounted by an eyewitness indicated a deliberate attempt to rob the victim. Because of the victim's lack of cooperation, out of anger the defendant pointed his weapon and shot directly into the vehicle where the victim was sitting. Upon questioning by the police, the defendant admitted that he was the one who shot the victim. The probability that the result of this trial would have been different had trial counsel given an opening statement simply does not exist.

4. *Allegations that counsel failed to object during trial and closing argument and that counsel made prejudicial remarks during his closing argument.*

The defendant asserts that there were three significant errors made by trial counsel during the course of the trial: (1) The defendant notes that statements made during the State's closing argument amount to prosecutorial misconduct, yet trial counsel failed to object; (2) the defendant questions the substance of his counsel's closing statement; and (3) the defendant asserts that trial counsel's failure to object to testimony of Dr. Vile was prejudicial.

(1) *Prosecutorial misconduct.*

The defendant objects to the following statements made by the State during its closing argument: (1) "It is very popular nowadays not to take responsibility for your acts"; (2) "you [the jury] have the power in your hands to say to this defendant, 'We reject the insanity defense. You are not insane. You are just brutal'"; and (3) "Abraham Orr said, 'I am taking it and if you resist, this is what happens to you. You are dead.'" The defendant contends that the

final statement misquotes him and that trial counsel's failure to object forecloses his ability to appeal on this issue. "[R]eversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument where no contemporaneous objection is lodged." *State v. Sexton*, 256 Kan. 344, 363, 886 P.2d 811 (1994) (quoting *State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 [1991]).

The defendant relies upon *Mincey v. State*, 314 S.C. 355, 358, 444 S.E.2d 510 (1994), wherein the Supreme Court of South Carolina held that the failure of the defendant's trial counsel to object to prejudicial statements made by the prosecutor was ineffective assistance of counsel. However, the comments in *Mincey* dictated the result and have little to do with the comments made in this case. In *Mincey*, the prosecutor made several comments suggesting that the defendant had threatened witnesses to testify in his favor. The court noted: "It would be a 'prostitution of justice' to permit evidence that someone attempted to influence a witness by fear or fright without any evidence that connects the defendant with the tampering." 314 S.C. at 358. The court held that the defendant was prejudiced by these comments and that counsel was ineffective. 314 S.C. at 358.

In this case, we conclude that the absence of an objection by trial counsel was not unreasonable professional conduct. Even if we were to assume that it was, the failure to object does not raise a reasonable probability that the result of the trial would have been different.

(2) *Closing argument.*

The defendant objects to statements made by trial counsel in his closing argument that appear to concede the defendant's guilt. Any allegations of ineffective assistance must be examined within the totality of the circumstances. *Chamberlain*, 236 Kan. at 657. Thus, the objectionable comments must be read in the context of the entire closing argument as well as the overall defense strategy.

While trial counsel admitted in closing argument that the defendant committed the crime, that fact was never at issue during the trial. Trial counsel emphasized that the act was "scary," irrational,

and not the act of a sane man. These comments are consistent with the defenses of insanity and diminished capacity. The nature of the remarks is not objectively unreasonable.

" 'It is one of the characteristics of human experience that hindsight often reveals alternative courses of conduct that may have produced different results if only they had been employed. Hindsight, however, is not the vantage point from which we judge allegations of incompetence. [Citation omitted.] It may be that had defendant's counsel on appeal conducted the defense at trial, he would have done things differently. Whether or not he would have fared better before the jury is a matter of conjecture. Where experienced attorneys might disagree on the best tactics, deliberate decisions made for strategic reasons may not establish ineffective counsel.' " *Crease v. State*, 252 Kan. 326, 338, 845 P.2d 27 (1993) (quoting *State v. Kendig*, 233 Kan. 890, 896, 666 P.2d 684 [1983]).

We conclude that the comments of counsel fall within the wide range of reasonable conduct.

(3) *Failure to object to testimony.*

The defendant complains that trial counsel did not object to Dr. Vile's statement that he examined the defendant pursuant to a court order. The defendant argues that Dr. Vile's statement suggests that the results of the examination were endorsed by the court, which provided Dr. Vile's testimony with more credibility. The failure to object under these circumstances "can well be considered part of reasonable defense strategy." *State v. Crossman*, 229 Kan. 384, 390, 624 P.2d 461 (1981). However, the record is inconclusive as to whether the defense counsel made a tactical decision here. At the same time, we are not prepared to say that trial counsel's failure to object fell below the range of reasonable professional assistance. Moreover, it is unlikely that the inference suggested by the defendant is present and, if it is, that it carries as much weight as the defendant suggests.

5. *Allegations that counsel presented the theory that the killing was accidental, which provides no legal defense to felony murder.*

The defendant argues that trial counsel presented a defense, that of accidental death, which is wholly ineffective against a charge of felony murder. The defendant asserts counsel's mistake is illustrated in two ways. First, the defendant points to counsel's chal-

lenge to the jury instructions at trial. During discussion of the proposed jury instructions, out of the hearing of jury, the defendant's counsel stated:

"Yes, for the record, the amended complaint in Count I charged the defendant with willfully, feloniously and unlawfully killing a human being, to-wit: Edward Lees, and therefore, we would request that willful be used in the instruction and we also [sic] to an instruction on second-degree murder.

. . . .

"Because essentially, you are allowing the State to amend the complaint at this late stage and the question of whether they can do that depends on whether you can do that without prejudicing the defendant, and clearly, *part of our defense was showing that it was an accidental shooting and we went into this on direct with him. By doing so, it hurt us some on our insanity defense, so clearly, there is prejudice there.*" (Emphasis added.)

Second, the defendant objects to counsel's line of questioning of the defendant, which brought out the defendant's lack of intent to kill Lees:

"Q. What did you do [when Lees did not respond to your gestures toward him with the gun]?

"A. I got—I started—I started getting mad, you know. I was like dang, you know. I didn't want to hurt nobody, so I just turned around. At that point in time, I seen his head move and he put it in reverse, so I raised the gun up and I tried to make—not to him. I tried to make it go through like the window, the driver window, to go through the windshield in front, but apparently I didn't, you know, and I started backing up and I fired.

"Q. Did you intentionally shoot him?

"A. No."

The defendant concludes from the above evidence that counsel either did not know that lack of intent is not a defense to felony murder or deliberately chose two contrasting defenses which gave the jury no choice but to convict.

In response, the State asserts simply that defense counsel did not rely on lack of intent to kill as a defense to felony murder. Evidence is shown in a letter from trial counsel to the defendant explaining this exact legal point: "It would be very difficult to get a jury instruction on second degree murder since it really does not matter in a felony murder case whether the death was accidental or intentional." Further, the State explains that counsel's com-

ments regarding jury instructions do not reflect counsel's defense strategy.

The trial court, hearing this allegation on remand, held that the above letter, as well as statements made by counsel at the hearing, proved that counsel did not think accidental death was a defense to felony murder. The court rejected the defendant's contentions regarding the direct examination and concluded:

"When Orr elected to testify, counsel attempted to bolster the admittedly weak insanity defense with the testimony by showing the Defendant's state of mind at the time of the shooting. In looking at the totality of the circumstances at the time of the trial, it must be remembered that the Defendant had confessed, the motion to suppress the confession had been denied, and there was an eyewitness who had identified the Defendant as the shooter. The Defendant had little to lose in deciding to testify if his testimony could in anyway assist his only real defense, *i.e.*, insanity."

The trial court found no merit to the claim of ineffective assistance of counsel on this issue.

All parties agree that lack of intent or accidental death is not a defense to felony-murder. See *State v. Hoang*, 243 Kan. 40, 43, 755 P.2d 7 (1988). The record demonstrates that the defendant's claim that trial counsel did not know that accidental death is not a defense to felony murder is untenable. Counsel's letter to the defendant unquestionably rebuts that contention.

Trial counsel's direct examination illustrates full knowledge of the felony-murder rule. Trial counsel's questioning shows he was primarily attempting to illustrate that the defendant did not know it was wrong to steal the car at the time of the crime, thus asserting the defendant was legally insane. Felony murder is premised on the guilt of the underlying crime. PIK Crim. 3d 56.02. If the defendant had been acquitted of aggravated robbery on the basis of insanity, the defendant could not have been convicted of felony murder. Thus, whether the defendant had an intent to kill was irrelevant for the jury's determination. Therefore, trial counsel's line of questioning is not unreasonable.

Finally, trial counsel's request for a jury instruction on second-degree murder was reasonable advocacy on his client's behalf. Instruction on lesser included offenses is considered an important

component of a criminal trial in Kansas. If evidence at trial merits a lesser included offense instruction, "a court is under an affirmative duty to give an instruction on a lesser included offense . . . even if a defendant fails to request it. *State v. Cummings*, 242 Kan. 84, 91, 744 P.2d 858 (1987)." *State v. Sutherland*, 248 Kan. 96, 101, 804 P.2d 970 (1991). Based on the wording of the complaint, which included "wilfully" as an element of felony murder, and the fact that evidence was presented regarding lack of intent to kill, it was reasonable to request the instruction on second-degree murder.

The trial court properly granted the prosecution's motion to amend the complaint by deleting the word "willful." See K.S.A. 22-3201(e) and *State v. Barncord*, 240 Kan. 35, 38, 726 P.2d 1322 (1986). In granting the amendment, the trial court determined that the defendant's substantial rights were not prejudiced with the removal of "willful" from the complaint. It follows from that amendment that the trial court's refusal to instruct on the lesser included offense was correct. However, the request for an instruction on second-degree murder based upon the complaint before amendment, made outside the presence of the jury, was reasonable and not prejudicial.

6. *Allegations that counsel failed to seek suppression of photograph taken of the defendant.*

During testimony of Detective Ward, the officer who interviewed the defendant, a photograph of the defendant was admitted into evidence. The photograph was taken of the defendant while he was in custody. Ward explained that the photo was taken for use in a photographic array of suspects. The defendant's trial counsel did not object to the photograph. The defendant argues that trial counsel's decision not to seek the suppression of that photograph was unreasonable and prejudicial. The defendant relies on K.S.A. 38-1611(a)(2) and *Simmons v. United States*, 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968), for support.

The defendant alleges that the taking of the photograph was illegal, that the photograph was the fruit of an illegal arrest, and that counsel acted improperly by failing to request suppression of

the photograph. Without providing explanation why the arrest was illegal, the defendant suggests that the photograph was taken in violation of K.S.A. 38-1611, which generally prohibits the taking of photographs and fingerprints of juveniles in custody.

However, the defendant was charged with two felonies and tried as an adult. K.S.A. 38-1611(a)(2) specifically authorizes the taking of a photograph of a juvenile in the defendant's position. The defendant's contention that the taking of the photograph was illegal is without merit.

The defendant asserts that *Simmons* prohibits any conviction based on an identification that is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384. The *Simmons* holding focuses on convictions based on eyewitness identification at trial that followed a prejudicial pretrial identification by photograph. While this statement of law is correct, the Supreme Court states that "[t]his is a claim which must be evaluated in light of the totality of surrounding circumstances." 390 U.S. at 383.

The defendant in this case was not identified through a photographic line-up. Chang, who was the eyewitness to the shooting, identified the defendant in court without mention of the photograph. Identity of the defendant as the shooter was not an issue in this case. The defendant's reliance on *Simmons* is misplaced. His contention is without merit.

7. *Allegations that the defendant was not fully advised of the consequences of his testifying at trial.*

The defendant alleges that his poor testimony at trial is proof that he was not fully advised of the consequences of choosing to testify. In addition, the defendant alleges that trial counsel failed to adequately prepare him for questioning. He argues that under the circumstances of his mental impairment, counsel was required to spend extra time explaining the pros and cons of testifying as well as reviewing his testimony.

The trial court addressing this same contention found that the evidence, including counsel's letter to the defendant, testimony at the remand hearing, and counsel's payment voucher, supported its

conclusion that trial counsel spent adequate time with the defendant to prepare for trial.

The Model Rules of Professional Conduct explain the scope of an attorney's representation of his or her client in a criminal case. Rule 1.2(a) (1996 Kan. Ct. R. Annot. 261) states: "In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and *whether the client will testify.*" (Emphasis added.)

At the first and third remand hearing, trial counsel testified that the defendant wished to testify. He also stated that he had discussed the pros and cons of testifying with the defendant. He stated that he felt that the defendant's testimony would help the jury to understand the defendant's state of mind at the time of the crime. Further, he testified that he and the defendant discussed questions and answers and the defendant's general behavior before the jury. After hearing the testimony unfold, trial counsel felt that the testimony was damaging and that he was surprised by the defendant's demeanor on the stand.

The defendant testified at the remand hearings that counsel had discussed the pros and cons of testifying with him. The defendant felt that his attorney was neutral on the issue of whether he should take the stand. The defendant testified that he made the final decision to testify at trial.

Trial counsel's conduct is objectively reasonable. As noted by the trial court:

"In looking at the totality of the circumstances at the time of the trial, it must be remembered that the Defendant had confessed, the motion to suppress the confession had been denied, and there was an eyewitness who had identified the Defendant as the shooter. The defendant had little to lose in deciding to testify if his testimony could in any way assist his only real defense, *i.e.,* insanity."

The fact that the defendant testified poorly or maintained a negative demeanor before the jury was out of the control of the attorney. This court cannot expect a trial attorney to guess the outcome of testimony, only that the attorney adequately prepare himself or herself and his or her client for trial. The record supports the lower court's conclusion that trial counsel adequately prepared the de-

fendant for trial. We conclude that the action of trial counsel falls within the wide range of reasonable professional assistance.

8. *Allegations that the defendant was denied competent psychiatric assistance.*

The defendant makes an alternative argument that if this court determines that trial counsel provided *adequate* assistance regarding the investigation into the defendant's medical history, then the defendant was provided *inadequate* psychiatric assistance. The defendant argues that both Dr. Vile's and Dr. Peterson's failure to view all records necessary for a thorough evaluation denied him due process. The trial court did not address the merits of the issue because it determined that this was not an issue on remand.

The State's primary response to this issue is to assert that it is outside the scope of the remand order made by the Court of Appeals. Because no objection to the adequacy of psychiatric assistance was made at trial, the State essentially argues that this issue was not preserved for appeal.

On appeal, the defendant argues that this issue arose when trial counsel stated that he relied on Dr. Peterson's expert advice when he decided not to further investigate the defendant's psychiatric records. Further, the defendant categorizes this issue as a violation of due process.

While there remains a serious question whether this issue was properly preserved on appeal, we elect to address the issue. This court will review an issue necessary to the preservation of a defendant's fundamental rights even if that issue is not properly preserved for appeal. *State v. Bell*, 258 Kan. 123, 126, 899 P.2d 1000 (1995). The defendant relies upon the cases of *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087 (1985), and *Mason v. State*, 489 So. 2d 734 (Fla. 1986), for the proposition that due process requires adequate psychiatric assistance. However, these cases do not stand for the broad proposition the defendant asserts.

*Ake* involved an indigent defendant who notified the trial court that he would be asserting an insanity defense to multiple murder charges. The defendant requested funds for a psychiatric evaluation, but the court denied the request. At trial, neither side pre-

sented expert testimony on the issue, and the jury convicted the defendant on all counts. The same issue arose at sentencing, and the defendant presented no evidence to rebut the State's claims on the likelihood of repeated violence. The defendant was sentenced to death. 470 U.S. at 72-73. The Supreme Court held:

"[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right." 470 U.S. at 83.

In this case, the defendant received evaluations from two different psychiatrists whose competence was not questioned until now. Unlike *Ake*, the facts in this case do not present a constitutional issue. The defendant makes no showing, other than to cite to medical journal articles, that either doctor was incompetent. The evidence at trial and upon remand established that the two psychiatrists were competent.

In *Mason*, the issue before the Florida Supreme Court was whether the lack of a competency hearing deprived the defendant of due process. In that case, the defendant had three psychiatrists evaluate and find him competent to stand trial and competent at the time of the offense. For that reason, the defense counsel had no duty to request a competency hearing. However, post trial, the defendant produced extensive evidence of a lifetime of severe mental illness. The Florida Supreme Court remanded for a nunc pro tunc competency hearing, as the record did not show whether the evaluating doctors had viewed the new evidence.

While the present case appears factually similar, there are several distinguishing facts. First, the defendant in *Mason* faced execution for his offense. Second, the evidence produced in *Mason* was much more extensive than in this case. Finally, Dr. Peterson had a chance to reevaluate his diagnosis with the new records, and

he only conjectured that further testing might have been helpful. We do not find *Mason* persuasive. Under all of the circumstances, we find little merit in the defendant's claim.

### ADMISSION OF THE DEFENDANT'S CONFESSION

The defendant contends that the denial of his motion to suppress his confession violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution. The trial court relied upon our decision in *State v. Young*, 220 Kan. 541, 522 P.2d 905 (1976), when it denied the defendant's motion to suppress. The defendant acknowledges that *Young* provides a basis for admission of his confession, but he claims our decision in *Young* is flawed and cannot serve as a reliable precedent in this case.

The issue in this case centers upon the defendant's request to call his parents during custodial interrogation. The defendant was 17 years old at the time. The defendant argues that such refusal is a per se violation of his constitutional rights under the Fifth and Fourteenth Amendments. *Young* rejects this argument and provides that the ultimate decision must be based upon the totality of circumstances.

Prior to trial, defense counsel filed a motion to suppress the defendant's confession. Evidence presented at the hearing of the motion established that on September 18, 1993, the defendant was seized by law enforcement officers at approximately 7 p.m. He remained in custody, and at approximately 10-10:10 p.m., Detectives Kelley and Ward began to interview the defendant. This interview lasted approximately 4½ hours. When the detectives first came into contact with the defendant, he appeared to be asleep. During the course of the interview, the detectives learned that the defendant was 17 years old and was a senior at Topeka High School. The defendant also advised them that his brother had recently been killed.

Before any questioning, Detective Ward advised the defendant of his *Miranda* rights. The defendant stated that he understood those rights and was willing to talk to the detectives. According to the detectives, the defendant at no time appeared to be under the influence of drugs or alcohol. The defendant stated that he was not

under the influence. He answered the questions posed in an appropriate manner. No threats or promises were made to the defendant during the course of the interview. The defendant did not ask to end the interview, nor did he request counsel. He was offered something to eat and drink on three occasions and was given a soda on one of these occasions. He was offered a polygraph test but declined, saying that he would not take one without his parents and a lawyer because he did not want the officers to "fuck him around." The defendant did state that he wanted to call his parents but was told by the detectives that he would be able to do so after the interview was concluded.

Based upon the above evidence, the trial court held that the defendant did not indicate that he wanted the interrogation to cease, nor did he request counsel. The court found that under the totality of the circumstances, the defendant's statements were freely and voluntarily given. In addition, the trial court, relying upon *Young*, found that a juvenile's request to call his parents does not necessarily constitute an assertion of his right against self-incrimination.

The defendant incorrectly asserts that *Young* supports the notion that the denial of a juvenile's request to call a parent during custodial interrogation can never violate any constitutional right. *Young* supports the principle that the ultimate decision will be made upon the totality of circumstances. The defendant attacks the validity of the decision in *Young*, charging that the *Young* court relied on precedent that was not on point to the facts of that case, while rejecting a California case directly on point. At this point it would serve no useful purpose to discuss the cases cited in the *Young* opinion because the decision is the established law in this state and has been consistently followed. *State v. High*, 260 Kan. 480, 483, 922 P.2d 430 (1996); see *State v. Hooks*, 251 Kan. 755, 764, 840 P.2d 483 (1992); *In re Edwards*, 227 Kan. 723, 727, 608 P.2d 1006 (1980); *State v. Cross*, 223 Kan. 803, 806, 576 P.2d 698 (1978). In our most recent case of *State v. Robinson*, 261 Kan. 865, 934 P.2d 38 (1997), we applied *Young* and the totality of circumstances test in determining admissibility of a juvenile's confession.

See also *Fare v. Michael C.*, 442 U.S. 707, 724-25, 61 L. Ed. 2d
197, 99 S. Ct. 2560 (1979) (applying totality of circumstances test).
  *Young*, 220 Kan. 541, Syl. ¶¶ 3-6, provides:

"A confession is not inadmissible merely because the person making it is a
juvenile. The age of the juvenile, the length of the question, the juvenile's educa-
tion, the juvenile's prior experience with the police, and the juvenile's mental state
are all facts to be considered in determining the voluntariness and admissibility
of a juvenile's confession into evidence."

"An adjudicated juvenile's request to call his father, prior to interrogation by
custodial officers, does not per se constitute an assertion of his right against
self-incrimination."

"The constitution and K.S.A. 38-839 afford no right to the presence of anyone
other than a lawyer trained to protect the legal rights of those accused. While the
presence or absence of a parent or responsible adult during the interrogation of
a juvenile suspect may be a factor affecting the voluntariness of a confession, there
is no constitutional right to the presence of a parent."

"A juvenile is capable of making an admissible voluntary confession, and there
is no constitutional requirement that he have the advice of a parent, guardian or
other adult."

"Whether a confession was freely and voluntarily given is based upon a consid-
eration of the totality of the circumstances, and where there is a genuine conflict
in the evidence great reliance must be placed upon the finder of fact."

We recognize that some jurisdictions apply a per se rule in sit-
uations where a juvenile, during custodial interrogation, requests
to talk with his or her parents. See Grisso, *Juveniles' Capacities to
Waive* Miranda *Rights: An Empirical Analysis*, 68 Cal. L. Rev.
1134, 1136-43 (1980). We adhere to *Young* as the better reasoned
approach and reject the defendant's request to overrule *Young*.
  The standard of review in determining the issue before us is:

"When a trial court conducts a full pretrial hearing on the admissibility of an
extrajudicial statement by an accused, determines the statement was freely, vol-
untarily, and knowingly given, and admits the statement in evidence, the appellate
court should accept the trial court's determination if supported by substantial
competent evidence. [Citations omitted.]" *Hooks*, 251 Kan. at 763.

This issue becomes whether the trial court's decision to admit
the defendant's confession rests on substantial evidence.

"Substantial evidence is evidence which possesses both relevance and substance
and which furnishes a substantial basis of fact from which the issues can reasonably
be resolved. Stated in another way, 'substantial evidence' is such legal and relevant

evidence as a reasonable person might accept as being sufficient to support a conclusion." *State v. Ratley*, 253 Kan. 394, 398, 855 P.2d 943 (1993).

The evidence relied upon by the trial court and the record before us demonstrate that the trial court's decision under the totality of the circumstances is supported by substantial evidence.

## THE SUFFICIENCY OF EVIDENCE

The defendant argues that the record shows insufficient evidence to support the jury's decision that the defendant was sane beyond a reasonable doubt at the time of the crime. The defendant asserts that the evidence shows the defendant was either insane or suffering from diminished capacity at the time the acts were committed. The standard of review for challenges to the sufficiency of evidence has been reiterated by this court:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Knighten*, 260 Kan. 47, Syl. ¶ 1, 917 P.2d 1324 (1996).

At trial, the jury was instructed on the defenses of insanity and diminished capacity. However, the jury rejected both defenses when it found the defendant guilty of first-degree murder and attempted aggravated robbery. The test used to determine insanity in Kansas is the *M'Naghten* test:

"The *M'Naghten* test/rule is that an accused is to be held not criminally responsible (1) where the accused does not know the nature and quality of the accused's act, or in the alternative, (2) where the accused does not know right from wrong with respect to that act. We adopted the *M'Naghten* test in *State v. Nixon*, 32 Kan. 205, Syl. ¶ 1, 4 Pac. 159 (1884), and have steadfastly adhered to that test." *State v. Baker*, 255 Kan. 680, 689, 877 P.2d 946 (1994).

On the other hand, evidence of a defendant's diminished capacity to commit a crime is admissible to negate specific intent but not to remove criminal responsibility. *State v. Jackson*, 238 Kan. 793, Syl. ¶ 1, 714 P.2d 1368, *cert. denied* 479 U.S. 821 (1986).

The following testimony was offered at trial regarding the defendant's sanity or lack thereof. Chang testified that the defendant had a "mad look on his face" when he threatened Lees with his

gun. One of the arresting officers stated that the defendant had a very cold demeanor when he was arrested and acted as if nothing had happened. A police officer who guarded the defendant at the Douglas County Law Enforcement Center prior to questioning observed the defendant to be relaxed. The defendant made small talk and dozed in his chair with his jacket behind his head.

Detective Ward, the police interrogator, testified to statements made by the defendant which reflected the defendant's state of mind. For example, Ward stated that the defendant said: "I don't give a fuck about that man. Nobody gives a fuck about my brother." Later he told Ward he did not know if he had pulled the trigger or if Courtney Crockett did. Nevertheless, Ward reported that the defendant told his friends that they needed to change their clothes as they fled the scene of the crime. The defendant insisted to Ward that the entire incident occurred because he just wanted to go home.

Rose Rodriguez, a behavior disorder research teacher in the Topeka schools, testified that the defendant was sullen and aloof after his brother's death. She also witnessed him at a school football game after his brother's death, acting as if he was under the influence of something. Katherine Kent, a clinical social worker who volunteers at Topeka High School, spoke of a great change in the defendant after his brother's death. She stated that he had been getting good grades and lacked behavioral problems in school but had become somber and unfriendly. The defendant's mother described the defendant's mood as quiet and always tense following her other son's death.

The defendant testified on his own behalf. He stated that after his brother died he "just didn't care about nothing anymore" and only smiled when he was under the influence of marijuana or alcohol. He stated he had suicidal thoughts every day. He noted that at age 13 he entered Stormont-Vail for psychiatric treatment. While the doctors prescribed medicine, he never filled the prescription. He stated that at the time of the crime, he was angry that Lees did not respond to his gestures. He expressed that he thought he was doing the right thing to take the car so he could get home. When asked if he knew at the time such conduct was prohibited

by law, he stated his "mind wasn't on that really." He only realized the illegal nature of the act when Crockett came into his interrogation room and told him he had confessed to what happened. On cross-examination, however, he stated that he knew that stealing the purse was an illegal act.

The State's rebuttal witness was a psychiatrist, Dr. Sheldon Vile, who examined the defendant to make a determination whether the defendant met the legal definition of insanity. After explaining his method of examination, Dr. Vile concluded that the defendant was not psychotic. However, he suggested that the defendant may suffer from antisocial personality disorder and possibly post-traumatic stress disorder. Dr. Vile determined the defendant was legally sane at the time of the crime.

Viewing all the evidence in the light most favorable to the prosecution, it is clear that a rational factfinder could have found beyond a reasonable doubt that the defendant was not legally insane and that he possessed the necessary specific criminal intent at the time of the commission of the crimes.

Affirmed.