**Abraham ORR, Petitioner,**

v.

**Michael A. NELSON, and the Attorney General of the State of Kansas. Respondents.**

**No. 98–3145–DES.**

United States District Court,
D. Kansas.

July 5, 2001.

Jean K. Gilles Phillips, University of Kansas, School of Law, Lawrence, KS, for Abraham Orr, petitioner.

Jared S. Maag, Office of Attorney General, Topeka, KS, for Michael A Nelson, Warden, ElDorado Correctional Facility, Attorney General of Kansas, respondents.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This is a petition for writ of habeas corpus, 28 U.S.C. § 2254, filed by an inmate of the El Dorado Correctional Facility, El Dorado, Kansas, with the assistance of the Paul E. Wilson Defender Project, University of Kansas School of Law. Orr was granted leave to proceed in forma pauperis, and an Order to Show Cause issued. The Defender Project submitted a Memorandum in Support of Petition, and respondents filed an Answer and Return including the state court records and transcripts of trial. Having considered all the materials filed, the court makes the following findings and order.

### CLAIMS

Orr claims that he was denied effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution, and Due Process as guaranteed by the Fourteenth Amendment as a result of defense counsel's failure to adequately investigate his medical, educational

and social background in preparation for trial. Orr asserts that as a consequence, defense counsel (1) failed to present sufficient evidence in support of Orr's suppression argument that his statements to police during pretrial interrogation were involuntary; (2) failed to adequately present Orr's defenses of lack of specific intent as to the attempted aggravated robbery, diminished capacity and insanity, and to secure a competent psychological evaluation in support of these defenses; (3) waived opening statement when he should have explained the complicated theories of defense, and failed to make a competent closing argument; and (4) erroneously relied on the defense of accidental killing believing there was no other viable defense.

## FACTUAL BACKGROUND

Orr was convicted in 1994 by a jury in the District Court of Douglas County, Kansas, of first-degree murder and attempted aggravated robbery for shooting a man who refused to surrender his vehicle which Orr intended to steal. Orr was sentenced to life plus 32 years. The factual scenario underlying Orr's conviction is detailed in the published opinion of the Kansas Supreme Court on direct appeal of Orr's conviction. *State of Kansas v. Orr,* 262 Kan. 312, 314—317, 940 P.2d 42, 47–48 (1997).

Orr filed a direct appeal of his conviction but, pursuant to appellate counsel's request, a procedure in Kansas allowing a claim of ineffective assistance of counsel to be heard first by the trial court was employed and the matter was remanded for a determination of that issue. *See Orr,* 262 Kan. at 316, 940 P.2d 42, *citing State v. Van Cleave,* 239 Kan. 117, 716 P.2d 580 (1986). The judge who presided at Orr's trial had retired so another of the same judicial district, Judge Murphy, heard the matter upon remand. Judge Murphy, recognizing that the case would normally be heard by the trial judge, held three

separate "extensive" hearings, and "granted the Defendant and the State greater leeway and time than might usually be necessary to present evidence and arguments." The Kansas Supreme Court noted:

the trial court considered all evidence presented and the authority submitted by the parties and addressed the four issues raised by the defendant. In a 16–page memorandum decision, the court concluded that "this was a difficult case to defend. Trial counsel provided reasonably effective assistance in the case, considering all of the circumstances and the evidence from his perspective at the time of defending Mr. Orr."

*Orr,* 262 Kan. at 316–17, 940 P.2d 42. The Kansas Supreme Court in a 23–page, thorough and well-written opinion rejected the ineffective assistance of counsel claim and affirmed Orr's conviction without dissent. There is no question but that petitioner's claims were decided on the merits in state court.

## STANDARDS OF REVIEW

### AEDPA

Having exhausted his state remedies, Orr filed this petition for federal habeas corpus relief. Because it was filed in 1998, it is governed by the habeas statute as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA). *Williams v. Taylor,* 529 U.S. 362, 402, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Act "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Id.* at 412, 120 S.Ct. 1495. Under the amended version of Section 2254(d)(1), a petitioner is entitled to federal habeas relief only if he can establish that the state court decision "was contrary to, or involved an unreason-

able application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). Under 2254(d)(1), a federal court may grant a writ of habeas corpus only if the state court reached a conclusion opposite to that reached by the Supreme Court on a question of law, decided the case differently than the Supreme Court has decided a case with a materially indistinguishable set of facts, or unreasonably applied the governing legal principle to the facts of the petitioner's case. *See Williams,* 529 U.S. at 412–13, 120 S.Ct. 1495. The two provisions implicated by petitioner's allegations are the "unreasonable application" clause of subsection (d)(1) and "unreasonable determination of the facts" under subsection (d)(2).

■ Section 2254(e)(1) requires a habeas court to presume that factual determinations made by the state court are correct, and places the burden on the petitioner to rebut that presumption by clear and convincing evidence. The Tenth Circuit Court of Appeals has stated that in light of *Williams,* factual findings are reviewed under a clearly erroneous standard and legal conclusions de novo. *Valdez v. Ward,* 219 F.3d 1222, 1231 (10th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1618, 149 L.Ed.2d 481 (2001), *citing Rogers v. Gibson,* 173 F.3d 1278, 1282 (10th Cir. 1999), *cert. denied,* 528 U.S. 1120, 120 S.Ct. 944, 145 L.Ed.2d 820 (2000). Under AEDPA, a habeas petitioner is not entitled to an evidentiary hearing in federal court if he "has failed to develop the factual basis of the claim in State court proceedings." *See Valdez,* 219 F.3d at 1230. Petitioner here had ample opportunity to develop his claims in state court, and does not state any exception which would require this court to hold an additional evidentiary hearing. *See* 28 U.S.C. 2254(e)(2).

■ The unreasonable application clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision. The critical question is not whether reasonable jurists agree [*Id.* at 889–90, *rejecting this test in Green v. French,* 143 F.3d 865, 870 (4th Cir.1998), *cert. denied,* 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999) ], or if the adjudication is devoid of record support or arbitrary, [*Matteo v. Superintendent,* 171 F.3d 877, 889 (3rd Cir.), *cert. denied,* 528 U.S. 824, 120 S.Ct. 73, 145 L.Ed.2d 62, (1999) *rejecting this test in O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998) ], but whether the state court's application of Supreme Court precedent was objectively unreasonable. *See Williams,* 529 U.S. at 410–11, 120 S.Ct. 1495.

■ Federal habeas courts are not precluded from considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable. *Matteo,* 171 F.3d at 890, *citing O'Brien,* 145 F.3d at 25. Such decisions may be "helpful amplifications of Supreme Court precedent." *Id.*

## *STRICKLAND V. WASHINGTON*

Petitioner's allegations are correctly styled as an ineffective assistance of counsel claim. The threshold inquiry is whether Orr seeks to apply "clearly established" Supreme Court law. That question is easily answered because the merits of an ineffective counsel claim are squarely governed by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Williams,* 529 U.S. at 390, 120 S.Ct. 1495.

In *Strickland,* 466 U.S. at 686–87, 104 S.Ct. 2052, the Supreme Court devised a two-step inquiry to determine whether a lawyer's poor performance deprived an accused of his Sixth Amendment right to

assistance of counsel. In order to establish an ineffective assistance claim, the petitioner must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced [his] defense." *Foster v. Ward,* 182 F.3d 1177, 1184 (10th Cir.1999), *cert. denied,* 529 U.S. 1027, 120 S.Ct. 1438, 146 L.Ed.2d 326 (2000). To establish deficient performance, Orr must show that his attorney made "errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment," *Williams,* 529 U.S. at 390, 120 S.Ct. 1495 *quoting Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; and that his legal "representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

To establish prejudice, Orr "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* The prejudice component focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Williams,* 529 U.S. at 393 n. 17, 120 S.Ct. 1495, *citing Strickland* 466 U.S. at 687, 104 S.Ct. 2052, and *Kimmelman v. Morrison,* 477 U.S. 365, 374, 393, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *see also Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The *Strickland* test "of necessity requires a case-by-case examination of the evidence." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

■ In a federal habeas challenge to a state criminal conviction, a state court's conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court, because the issue is "a mixed question of law and fact."

*Strickland,* 466 U.S. at 698, 104 S.Ct. 2052; *Foster,* 182 F.3d at 1184; *Williamson v. Ward,* 110 F.3d 1508, 1513 (10th Cir.1997). However, the subsidiary factual findings made by the state court in the course of deciding an effectiveness claim are entitled to the presumption under § 2254(e)(1). *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052; *see also Trice v. Ward,* 196 F.3d 1151, 1169 (10th Cir.1999). Unless Orr rebuts them by clear and convincing evidence, therefore, this court is required to accept as conclusive both the factual findings and the credibility choices of the state courts.

## DISCUSSION

### FAILURE TO INVESTIGATE

Orr's overriding claim is that trial defense counsel failed to adequately investigate his medical, educational and social background in preparation for trial. In *Strickland,* the Supreme Court discussed the duty of counsel to investigate:

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052; *Miles v. Dorsey,* 61 F.3d 1459, 1475 (10th Cir.1995), *cert. denied,* 516 U.S. 1062, 116 S.Ct. 743, 133 L.Ed.2d 692 (1996); *Williamson,* 110 F.3d at 1517. A fair assessment of attorney performance requires that every effort be made "to eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel's perspective at the time." *Dever v. Kansas State Penitentiary,* 36 F.3d 1531, 1537, (10th Cir.1994) *citing Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

The facts underlying the claim that Orr's counsel failed to adequately investigate include: In September, 1993, defense counsel Randy McGrath, a member of the indigent defense panel since 1981, was appointed to represent Orr. Prior to trial, McGrath filed notices that Orr would be relying on the defenses of insanity and diminished capacity. The court appointed a psychiatrist, Dr. Sheldon Vile, to evaluate Orr. After receiving a copy of Dr. Vile's report finding Orr competent to stand trial and legally sane at the time of the offense, McGrath asked for and was granted an order for funds to hire an expert to assist the defense. McGrath consulted Ron Wurtz, who was Chief Public Defender in Shawnee County. Wurtz highly recommended and McGrath hired, Dr. Stephen Peterson, a forensic psychiatrist. McGrath sent Orr's juvenile court, police, and some youth center records to Dr. Peterson, and agreed to get other records requested by the doctor. Dr. Peterson examined Orr for four hours, administered several tests, and consulted with McGrath immediately after the examination. At trial, Orr admitted shooting at the victim in the vehicle, but asserted insanity and incapacity as defenses as well as that he did not intend to hit the victim.

■ This court has carefully considered the state court decisions rendered in this case together with its own reading of the record. In order for a state court decision to be "contrary to" clearly established Supreme Court law it must be "substantially different" from the relevant Supreme Court precedent. *Williams*, 529 U.S. at 405, 120 S.Ct. 1495. Orr is not entitled to relief under the "contrary to" clause because the state courts' decisions in this case are not substantially different from *Strickland.* Both the state district judge hearing the remand and the Kansas Supreme Court correctly identified *Strickland* as the controlling legal authority, and applied that framework in rejecting Orr's

ineffective assistance of counsel claims. *See Williams*, 529 U.S. at 406, 120 S.Ct. 1495; *Valdez*, 219 F.3d at 1232.

■ For the following reasons, this court also concludes that the state courts' adjudications of petitioner's claims were not objectively unreasonable or based on an unreasonable determination of the facts so as to entitle Orr to relief either under 2254(d)(1) or (2). This court finds support in the record for and agrees with the trial court's and the Kansas Supreme Court's determination that counsel's decision not to investigate further was based upon adequate investigation and was reasonable under the circumstances. The Kansas Supreme Court reasoned:

> Based upon the findings of fact made by the trial court, which are supported by substantial competent evidence, we agree with the trial court that the trial counsel under all the circumstances made a reasonable investigation of the defenses of insanity and diminished capacity. The findings of fact are supported by the evidence on record, and while the evidence may support a different conclusion, we recognize that the trial court was present at the hearing, had the opportunity to view the witnesses testifying, had the ability to weigh the credibility of the witnesses, and made its determination of fact based upon being present.

*Orr*, 262 Kan. at 327, 940 P.2d 42.

Orr's claim that counsel did not adequately investigate his background is largely dependent upon his assertion that the medical expert hired to advise and assist the defense, Dr. Peterson, needed to see all Orr's background records in order to make a competent psychological evaluation. McGrath testified at the remand hearings that while he was in the investigative process of obtaining more records Dr. Peterson had requested, the doctor

interviewed Orr and unequivocally concluded Orr was sane. McGrath further testified that Peterson advised him following the interview that he would not need any other records. Dr. Peterson, on the other hand, testified at one of the remand hearings that he received only part of the records he requested prior to his interview with Orr; and that he told McGrath his evaluation was limited by the partial information he received. The state court found McGrath's account of their conversations more credible.

Petitioner in essence urges this court to redetermine this factual dispute in his favor. Whether defense counsel was told by Dr. Peterson that Orr was "not even close" to insane or of diminished capacity and that additional records were no longer required, as McGrath testified, were questions of fact underlying the legal question of whether counsel was ineffective. Whether Dr. Peterson's testimony was more credible than defense counsel's was an issue solely within the province of the trier of fact hearing the testimony on remand. *Valdez*, 219 F.3d at 1238, *citing United States v. Castaneda–Reyes*, 703 F.2d 522, 524 (11th Cir.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 174, 78 L.Ed.2d 157 (1983); *United States v. Walker*, 524 F.2d 1125, 1128 (10th Cir.1975). This court presumes that the state courts' subsidiary factual findings are correct under section .2254(e).

Orr has not offered any additional evidence and merely argues from the record that Dr. Peterson was more credible, even while implying his evaluation was incompetent. Orr's argument does not amount to clear and convincing evidence that the state court's findings on this issue were incorrect. *Valdez*, 219 F.3d at 1231. After reading the transcripts of the remand proceedings and trial, this court concludes that there is support in the record for these factual findings of the state court.

Given these crucial facts, this court cannot say that the Kansas court's determination (that counsel adequately investigated Orr's mental defenses) was unreasonable. Defense counsel McGrath had received the report of the court-appointed medical expert who found his client legally sane. He then had the oral report from his own hired expert that Orr was not even close to insane, plus his advice that additional records need not be reviewed and might even result in the disclosure of unfavorable information. McGrath had talked several times to contacts at the Youth Center at Topeka and the public schools and reviewed their records concerning Orr. He had also talked to Orr's social worker, parents and girl friend. He had been told by Orr's parents that Orr was on disability and had asked them to provide records. It would have been optimal for counsel to have obtained and reviewed every record ever generated regarding Orr's background and to have provided those to Dr. Peterson prior to his evaluation of Orr. This is clearly not a case where counsel left no stone unturned, but it is also not a case where counsel did no investigation. Nor is this a case where the overlooked evidence is so convincing and different from the evidence presented at trial, that confidence in the outcome is, undermined. This court finds defense counsel's performance reasonable under all the circumstances evaluated from counsel's perspective at the time.

Orr also asserts in support of his petition that no medical evidence regarding Orr's sanity was presented by the defense at trial. The jury was presented with such medical testimony although it was not favorable to the defense. Dr. Vile, who had evaluated Orr's sanity for the court, testified that based upon a 90–minute interview, he concluded Orr was legally sane, that is, Orr comprehended the difference between right and wrong at the time of the

crimes. The defense did not call its medical expert, Dr. Peterson, for the obvious reason that he had reached the same conclusion. McGrath testified that after having two experts conclude Orr was not insane, he believed he had to rely on lay testimony to support the mental defenses.

Orr's complaint that defense counsel in essence presented no defense is without merit. Orr's own testimony clearly fell within Kansas' *M'Naghten* test for insanity, in that he testified he did not know his actions were wrong. Orr insisted he thought he was doing the right thing by trying to get himself and his friends a ride home. The jury also heard testimony from several lay witnesses who stated that Orr seemed mentally unstable since his brother's death. There is no legal or factual basis for holding that McGrath should have considered the two evaluations prepared in connection with the trial to be incompetent and consulted additional experts, or that he committed constitutional error in relying on lay testimony.

Orr contends that Dr. Peterson would have testified contrary to the court-appointed expert if he had reviewed all the records of Orr's medical and social background and had conducted further testing. These allegations are too speculative. Peterson did testify that had he seen the Stormont–Vail hospital and school records, which he first viewed in anticipation of the remand hearing, he would have been prompted to do further testing[1] on Orr. However, significantly, Peterson also testified that his review of these records had not changed his opinion so that he now believed Orr was insane at the time of the murder. *See Valdez,* at 1239. None of Peterson's testimony contradicted or called into question the evidence produced at trial.

Petitioner does not question that the evidence presented at trial was sufficient to uphold the jury's finding that Orr was sane beyond a reasonable doubt. Instead, he claims that defense counsel failed to present available evidence that would have convinced the jury of his insanity. Orr urges that the records McGrath did not obtain "would have immeasurably proven the defenses" and contained "indisputable" and "powerful evidence of Mr. Orr's mental defects." These conclusory assertions do not have sufficient factual support in the record.

Orr insists that McGrath was ineffective for failing to acquire his 1989 Stormont–Vail medical records. Consequently, this court has carefully reviewed the records from this single hospitalization. Orr was hospitalized when he was 13 years old pursuant to court order for an "in patient evaluation" after appearing in court for breaking and entering, and stealing. It was noted that he began stealing at age 11, had been in juvenile court on two prior occasions, and was exhibiting aggressive and hostile behavior at school (Discharge Summary 9/8/89). He was not hospitalized as the result of a psychotic episode or for treatment of a mental disease. He was in the hospital for 14 days.

It is stated in these records that Orr had never been in counseling before, no psychosis was noted, Orr denied having hallucinations, and had received no past psychiatric or psychological treatment. These records also indicate that Orr's parents, who probably were alcoholics, were not providing needed structure, were either unable or unwilling to make Orr improve his behavior, and either denied or minimized his deviant behaviors. It was also noted that the parents knew Orr stole and

---

**1.** There is no evidence that Peterson actually did further testing on Orr which changed his opinion.

allowed him to keep stolen goods at home, as well as to drink several beers a week. It was further noted that Orr had been involved in an attempted rape with his brother, that his father and brother encouraged physical fighting, and the family was seen as "very dysfunctional."

Psychiatric, psychological and physical tests and interviews were performed. Some recorded observations include "oriented", "estimated IQ of 70 within the mild mental retardation range" but "low estimate of his ability", "some reading difficulties", "memory intact," probable very mild organic brain difficulties related to borderline retardation, "wide fluctuations cognitively," and some visual perception difficulties. Doctors also observed, "severe psychopathology not suggested." Some diagnostic comments include asocial behaviors and thoughts, difficulty with feelings, low frustration tolerance, easily angered, aggressive, unpredictable behavior, defiant, aloof, at least mildly depressive "probably related to present circumstances," low motivation, probable border line personality disorder and "normal awake and sleep EEG." The most often repeated term is "conduct disorder." It is noted that Orr showed little remorse, did not desire to change his problem of stealing, wanted to handle his anger and stop fighting, and would be difficult to treat. No clinical recommendations were made, but Orr was found to need closer supervision. It was recommended that temporary SRS custody and behavior disorder classroom assignment be continued, that he be placed in a group home outside his parents' home, and that he take Prozac for his depression which increased during his hospitalization. He was discharged to his home to await out of home placement.

The court has also reviewed the other records exhibited at trial and the remand hearings, those which were and were not obtained by defense counsel prior to trial.

Orr's juvenile court records reveal that he had an extensive history of criminal behavior including stealing vehicles. He appeared in juvenile court for theft in 1987, and breaking and entering in 1989. He was first placed in the Youth Center at Atchison (YCAA) in April 1990. He was released to a foster home, but soon ran away and was returned to YCAA until August, 1991. A month after his release, he was charged with attempted theft of a car. He was also charged with robbery and theft in November 1991 and adjudicated a juvenile offender. The court then directed placement at the Youth Center at Topeka (YCAT) in December, 1991. He was released in November, 1992.

Orr's school records indicate that due to poor academic performance and speech and language problems, he was tested for learning disabilities at the beginning of his grade school years in 1981–82 but not recommended for special education services. In May, 1989, he was evaluated for a behavior disorder program on account of his poor grades, repeated suspensions and disruptive behavior in public middle school. He was found to have a borderline IQ, impulsivity, and poor auditory comprehension; but it was suggested that he remain a regular education student. "[N]o evidence of a thought disorder or other major mental disturbance" was discovered. (Topeka Public Schools U.S.D. # 501 Psychological Report, 5/17/89, at 2). After being in "Chronically Disruptive Behavior" classes in middle school, it was determined in January, 1990, that Orr should be removed from public school. His school infractions included verbal assaults on teachers and students, leaving classes, refusing to follow directions, and involvement in fights or near fights. He was placed in the alternative Capital City Schools (CCS). He did well enough there to be recommended to attend public school in the fall of 1990. However, he went from CCS to YCAA instead. While at the YCAA, he

attended the 90–91 school year at its Bert Nash High School. While at YCAT, he attended its Lawrence Gardner High School during the 91–92 school year, where he "performed well in class." Upon release from YCAT, he was returned to CCS which he apparently attended until January, 1993. CCS staff determined Orr would begin at the public Topeka High School (THS) in the spring 1993, but spend 2 hours a day in a behavior disorder class. His transcript indicated that he earned 3 A's and 3 B's during the 1993 spring semester at THS. Orr's brother Tim was shot and killed on September 1, 1993. During the 1993 fall semester, Orr attended school only four days before this offense occurred on September 18.

Orr's Social Security records include his application for disability determination filed by his parents in July, 1992. The application indicates a primary diagnosis of "conduct disorder" and secondary diagnosis of "depression." Among the evidence considered were an examination dated October, 1992, by Dr. S. Mintz, Ph.D.; Orr's youth center records; and the Stormont–Vail records. The claim was allowed in November, 1992, because Orr was found to have "a severe impairment" of "comparable severity to limitations which would be considered disabling in an adult." He was specified to have "moderate impairment" of "development/function" in several areas: cognitive, due to his low IQ; social, due to his conduct disorder; and behavioral, due to depression and history of conduct disorder symptoms. The Psychological Test Report of Dr. Mintz indicates that Orr told

this doctor he had stolen about ten cars. Mintz found that Orr exhibited a "range of behavioral difficulties" and functioned "within the borderline intellectual range." Orr was expected to improve so his case was to be reviewed in about three years. The logs kept by Orr's social workers disclose information about Orr's family including that Orr's mother seemed to be high during a home visit, and his father was in prison.

The youth center records compiled during Orr's incarcerations include evaluations of his behaviors at the institutions, and background information.[2] He was psychologically assessed on at least three [3] occasions in connection with juvenile adjudications at Stormont–Vail (%9), the YCAA and YCAT. The Psychological Test Report at YCAA indicated that in 1990 Orr scored 88, in the low average range, intellectually. At YCAT, he was "seen for about four hours" for testing and diagnostic interviews in 1992. This evaluation indicated Orr's intelligence to be in the "upper regions of the Borderline range," and that he had been involved in illegal behaviors since age seven. "No indications of a psychotic process or neurological impairment" were found. Observations included that Orr expressed no remorse for past criminal conduct, needed to develop empathy for others, had several relatives who had committed crimes, had insufficient parental supervision, improved in a very structured environment, did not feel he needed to obey the law, and lacked anger control. These records also included daily logs of Orr's activities [4].

2. Dr. Eaton's and Dr. Schulman's reports from the Stormont–Vail hospital records are included in the youth center records indicating they might have been available for review by defense counsel and Dr. Peterson who had some youth center records prior to trial.

3. Since Orr was also assessed by school psychologists and during the Social Security disability determination, his background included at least five evaluations.

4. Although it is not clear which youth center records defense counsel had and gave to Dr. Peterson, it does appear that the daily logs were not among them. Those logs do not reveal any evidence favorable to Orr's mental defenses.

The state district court determined that the omitted evidence was insufficient to affect the outcome of trial. This court has carefully reviewed all the background records and does not find evidence that Orr was legally insane or incapacitated either prior to or during the offense. Instead, at least three evaluations resulted in conclusions that there was no psychosis present; and none of the several experts who evaluated Orr at the youth centers, schools, hospital, or for social services ever diagnosed Orr as insane[5]. Orr was diagnosed as suffering from borderline mental retardation or low intellectual capacity, chronic depression[6] and misconduct disorder. Certainly these records would have provided mitigating evidence, especially had Orr been facing the death penalty. But, the claim is not that counsel failed to provide mitigating evidence[7]. Thus, this court finds that counsel's performance was not deficient for failing to obtain and present the information contained in these records.

As previously indicated, to prevail on this claim Orr must show both ineffectiveness and prejudice. This court might have concluded Orr fails to satisfy *Strickland*'s prejudice requirement without deciding whether Orr could show deficient performance. Trial counsel did in fact prepare and present lay evidence of insanity and incapacity. Through Orr's teachers and family and Orr's own testimony, he presented evidence of Orr's depression at the time of the crimes. Orr had provided McGrath with names of counselors and information regarding his mental health and medical evaluations. McGrath testified at the remand hearings that he talked to Terri Masters at the Youth Center at Topeka and obtained records concerning Orr. He also spoke with Kay Kent (social worker at THS), Rose Rodriguez (BD teacher at THS), Orr's parents and girlfriend, and Ken Barker about Orr. He testified that to the best of his knowledge, he investigated all of the witnesses and names given to him by Orr. Orr testified that he spent his childhood in youth centers and foster care. Orr even testified without challenge that his hospitalization at Stormont–Vail was for psychiatric treatment. Orr's testimony was the only available evidence that he did not know his actions were wrong. Evidence was gathered and could have been presented of Orr's possible mental retardation.[8] Thus, much of the evidence Orr complains counsel did not discover was actually discovered and generally presented. *See Cooks v. Ward*, 165 F.3d 1283, 1293 (10th Cir.1998)

5. Dr. Schulman's testimony at a remand hearing that Orr was suffering from Post Traumatic Stress Disorder at the time of the crimes due to his brother's death and was unable to form intent is conflicting evidence in the record. However, the judge hearing that proceeding did not credit this opinion formulated two years after the crimes. *See Miles*, 61 F.3d at 1473.

6. One diagnosis included dysthymia which is a chronic mood disorder, less severe than a major depression, marked by despondency and loss of interest in activities, and lasting more than two years. *See Williamson*, 110 F.3d at 1515.

7. To the contrary, Orr challenges counsel's attempt to mitigate Orr's criminal behavior by offering evidence that Orr did not intend to hit the victim when he shot into the vehicle. Orr argues that lack of intent is no defense to felony murder so counsel's proffer of such evidence indicated incompetence.

8. Surprisingly, Orr's school records indicate that he advanced each year and made very good grades his last semester in public school. The records and testimony indicated that some teachers found him to be a hardworking, cooperative and capable student. Records also indicate that while Orr has tested borderline retarded, he has also tested low normal and the tests may not reflect his ability. Thus, defense evidence of mental retardation at the time of the crimes might have been effectively rebutted by the prosecution.

*cert. denied,* 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999). Cumulative evidence would not have caused the jury to reach a different result. *See Moore v. Reynolds,* 153 F.3d 1086, 1099 (10th Cir.1998) *cert. denied,* 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 362 (1999); *see also Nguyen v. Reynolds,* 131 F.3d 1340, 1349 (10th Cir. 1997) *cert. denied,* 525 U.S. 852, 119 S.Ct. 128, 142 L.Ed.2d 103 (1998).

Moreover, this court is not at all convinced that the additional evidence would have caused the jury to reach a different result. The Tenth Circuit has stated:

> We have on numerous occasions determined that evidence of a troubled childhood involving physical, emotional, sexual and/or substance abuse does not outweigh evidence supporting the conviction ..; nor does evidence of low I.Q. and/or organic brain damage. (cites omitted)

*Foster,* 182 F.3d at 1189 (citing cases).

The evidence against Orr was overwhelming. Proof that Orr killed the victim with intent to commit robbery included his oral confession at the Lawrence Law Enforcement Center (LEC), his written confession at LEC, the eyewitness testimony of the victim's girlfriend who was sitting next to him in the vehicle when he was shot, and Orr's own testimony at trial where he admitted that he shot the gun through the victim's windshield in an attempt to steal his vehicle. The gun belonging to Orr and bullets were recovered. In addition, the three other youth with Orr at the time of the crimes had reported his involvement during police interviews and could have been called as witnesses against Orr at trial. Moreover, a jailer overheard Orr during a telephone conversation state that he shot the victim while trying to steal his vehicle. Considering the strength of the government's case, along with the additional and generally cumulative or insubstantial defense evidence that might have been presented, there is not a reasonable probability that, absent the alleged inadequacy of the investigation, the jury would have concluded Orr was not guilty. *See Strickland,* 466 U.S. at 695, 104 S.Ct. 2052; *Walker v. Gibson,* 228 F.3d 1217, 1233–34 (10th Cir.2000); *Castro v. Ward,* 138 F.3d 810, 832–33 (10th Cir.) *cert. denied,* 525 U.S. 971, 119 S.Ct. 422, 142 L.Ed.2d 343 (1998); *Cooks,* 165 F.3d at 1293. This court's confidence in the outcome of Orr's trial is not at all undermined.

Orr cites several Circuit Court cases holding that a defense attorney's failure to fully investigate his client's psychological problems was unreasonable and amounted to ineffective assistance. These cases do not convince this court that Orr is entitled to relief since they either involved substantial evidence of insanity or incompetence, or the sentencing phase in a capital case [9].

For example, *Profitt v. Waldron,* 831 F.2d 1245 (5th Cir.1987), cited by Orr, is factually distinguishable because counsel failed to examine psychological records of his client who had previously been adjudicated insane by a court and committed to a mental institution from which he had escaped. *Bouchillon v. Collins,* 907 F.2d 589 (5th Cir.1990) is also distinguishable because trial defense counsel did no investigation whatsoever after having been informed that his client had been institutionalized several times for mental problems. Moreover, defendant was found to have a "clinically recognized mental disorder" beyond depression.

*Beavers v. Balkcom,* 636 F.2d 114 (5th Cir.1981) is distinguishable because the defendant had been confined to a state men-

---

9. A capital case calls for closer scrutiny of the attorney's performance during the sentencing phase (*Cooks,* 165 F.3d at 1294), and involves the presentation of any evidence which might be mitigating, rather than evidence proving the legal defenses.

tal institution twice for a total of 14 months. Moreover, neither the State nor defense counsel had obtained the opinion of a psychiatrist as to defendant's sanity. Orr's counsel conducted an investigation into Orr's background, hired and consulted a forensic psychiatrist, and was faced with a court-appointed psychiatrist's conclusion that his client was not insane. Orr had never been diagnosed as insane, and defense counsel concluded that further investigation was unnecessary and might even lead to damaging evidence. *See Dever,* 36 F.3d at 1537.

■ *Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir.) *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991), is more factually similar where defendant claimed that defense counsel failed to investigate and present available family, social, and psychological history; and Kenley had been diagnosed [10] with personality and emotional disorders rather than mental illness or defect. Although the Eighth Circuit found counsel ineffective for not further investigating defendant's background, defendant was sentenced to death and counsel had failed to present this or any mitigating evidence whatsoever at the sentencing phase of his trial. While evidence of behavior, drug and childhood problems

is "precisely" the type of mitigating information which might properly persuade a jury not to impose the death penalty in a particular case, it is not necessarily evidence of insanity [11] which would absolve a defendant during the guilt phase of a trial. *See id.* at 1307; *cf. Brewer v. Reynolds,* 51 F.3d 1519, 1524 (10th Cir.1995) *cert. denied,* 516 U.S. 1123, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996).

The most pertinent case relied upon by Orr is *Williamson,* 110 F.3d at 1508, since it was decided by the Tenth Circuit Court of Appeals and included the claim that Williamson was denied competent counsel during the guilt phase of his trial by his attorney's failure to adequately investigate and use evidence of Williamson's mental illness. However, *Williamson* is also clearly distinguishable from this case. Williamson, who received the death penalty, had recently been declared incompetent to stand trial on another charge and confined in the state hospital. He was described by the court as having an "extensive" history of mental problems and "severe illness that produced delusions and a distorted perception of reality [12]." *Id.* at 1520. In addition, Williamson had been granted disability benefits because it was expected he would need long-term in-

---

10. Orr's background was not nearly as severe as Kenley's which included an abnormal EEG suggesting possible convulsive disorder, "suicidal tendencies," an abusive father who had a chronic mental illness, and drug and alcohol problems.

11. To show that someone is mentally retarded does not prove insanity. All individuals designated as mentally retarded "share the common attributes of low intelligence and inadequacies in adaptive behavior." *Penry v. Lynaugh,* 492 U.S. 302, 344–45, 109 S.Ct. 2934, 106 L.Ed.2d 256 (Brennan, dissenting opinion). In order to be completely exculpated from criminal responsibility on the basis of mental retardation alone, a defendant would most likely be profoundly and severely retarded (IQ of 25 or below). *See Penry,* at

331–34, 337–38, 109 S.Ct. 2934. To show that someone has behavior disorders or suffers from depression is also not shown to establish insanity. Below average intelligence even borderline mental retardation coupled with some behavioral problems does not render a person incompetent to stand trial (*see Miles,* 61 F.3d at 1474), and is not shown to be sufficient evidence of legal insanity under any clearly established Supreme Court precedent.

12. There is no evidence that Orr was acting under any delusion when he attempted to steal the automobile or shot the victim, or that he was suffering from a distortion of reality or could not recall the details of the crimes.

stitutionalization. Williamson had been diagnosed with atypical bipolar illness, schizophrenic disorder, alcohol dependence as well as being delusional and disoriented at times; and had exhibited abusive and violent behavior during court proceedings. Moreover, aside from confessions of dreams about committing the murder (which might have been discredited by evidence that his "mental illness distorted his perception of reality"), the evidence against Williamson was "largely circumstantial and hardly overwhelming." Furthermore, counsel failed to present evidence that another man had credibly confessed to the murder. Finally, the court found a reasonable probability that Williamson was incompetent to stand trial, and held that the state court's adjudication was based upon an inaccurate characterization and "incomplete view" of the record.

Orr's case is closest factually to *Miles,* 61 F.3d at 1459, where counsel had obtained a recent psychological evaluation indicating no thought disorders, and the client had not demonstrated bizarre behavior. *See Williamson,* 110 F.3d at 1517, n. 11. There, the court held that defense counsel who had reviewed two psychological evaluations of his client and spoken with one of the evaluators, discovering that his client's intelligence was low and he suffered from learning disabilities and depression but was sane, had made a reasonable investigation into the facts. *Id.* at 1477.

These cases illustrate why the inquiry as to whether counsel exercised reasonable professional judgment in deciding to limit his investigation requires a case-by-case determination. This court has assessed the facts in the instant case in light of all the circumstances and, "applying a heavy measure of deference to counsel's judgments," finds that McGrath strategically chose not to further investigate Orr's background after a reasonable investigation. *Id.* at 1475–77, *citing Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

## INADEQUATE ARGUMENTS AND ERRONEOUS DEFENSE

Orr's contentions that defense counsel was ineffective for waiving opening statement and failing to make a competent closing argument are intertwined with his overriding claim that counsel failed to adequately investigate and present background information. Orr alleges that defense counsel "unreasonably waived opening statement based on his lack of preparation." Consequently, the finding that counsel's investigation was adequate negates a major premise of this claim. Moreover, the state court's adjudication that the waiver was a tactical decision was objectively reasonable.

Defense counsel testified at the remand hearing that he waived opening statement because he wanted to assess the evidence produced at trial before deciding whether or not Orr should take the stand. McGrath also testified that he was hoping for a defensive "coup" by arguing to the court that an instruction on second-degree murder[13] must be given because the word "willful," was incorrectly inserted into the

---

**13.** Orr sharply criticizes defense counsel for allowing Orr to testify that his shooting of the victim was accidental and for seeking an instruction on second-degree murder when intent is irrelevant to a charge of felony murder. Contrary to Orr's allegations, it is clear from the record that McGrath understood and related to Orr that lack of intent or accidental death is not a defense to felony murder. The state judge in his decision on remand (at 8) found that McGrath was "clearly not attempting to use 'accident' as a defense to the felony murder." This court presumes this finding is true. Moreover, this court agrees with the state supreme court that both tactics were "reasonable advocacy" for the reasons stated by that court in *Orr,* 262 Kan. at 336, 940 P.2d 42.

indictment charging felony murder. Comments by the trial judge hearing defendant's argument on the instructions and Judge Murphy who heard attorney Wurtz' testimony at the remand hearing indicate that although this argument was a long shot it was one worth pursuing. This is particularly true in this case where there was very little to be mustered in the way of a defense.

■ The latter observation brings this court to comment that the problem with the defense of Orr was not so much that defense counsel failed to obtain and use "even a fraction of" the "powerful," available, supportive evidence. Instead, the serious problem with the defense was that little to no exonerating evidence existed. As the state court noted, this was indeed a difficult case to defend. However, the difficulty arose not from matters such as the complicated nature of mental defenses, but because there was a dearth of evidence to support those defenses, which were the only conceivable ones given Orr's confessions and the strength of the State's case. One might speculate, with hindsight, that blanketing the jury with the numerous behavioral and psychological observations in the records and technical explanations of the defenses of insanity and incapacity could have been a more successful tactic. However, hindsight is not a proper measure of attorney effectiveness. *Strickland,* 104 S.Ct. at 2065. In this court's judgment, the state judge was correct in his conclusion that the entire post-conviction record, viewed together with the evidence presented at trial, did not raise a reasonable probability that the result of the trial would have been different had defense counsel presented all the available evidence relating to Orr's background and fully explained the mental defenses during opening and closing arguments. *See Williams,* 529 U.S. at 398, 120 S.Ct. 1495.

## CONFESSION

Orr asserts that a thorough investigation of his background would have revealed his "mental deficiencies and lack of capacity to understand Miranda warnings." He contends he should not have been held to have knowingly and intelligently waived his Miranda rights because his mental problems "would have" prevented him from comprehending and remembering the complicated concepts in the warnings. Orr further asserts that official coercion is shown in this case by his request to call his mother being denied, his being confronted by his friends saying they had confessed in order to "trick or induce" him into confessing, and his being questioned late into the night "to the point that he fell asleep during the interview." He complains that McGrath did not obtain the records and consequently did not present the evidence of his incapacity to understand Miranda which viewed together with the coercive tactics used by the police, would have constituted a "powerful case against admitting the confession."

■ The determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. *Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *Miranda v. Arizona,* 384 U.S. 436, 475–477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. *Michael C.,* 442 U.S. at 724–25, 99 S.Ct. 2560. The totality approach mandates inquiry into all circumstances including evaluation of the juvenile's age, experi-

ence with police, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. *Id.* at 2571. Where the age and experience of a juvenile indicate that his request for his parents is, in fact, an invocation of his right to remain silent, the totality approach will allow the court the necessary flexibility to take this into account in making a waiver determination. *Id.* Under Supreme Court precedent, Orr's mental retardation or mental condition, if any, is not grounds for suppression on due process grounds of a custodial confession as involuntary, absent a showing of official coercion or misconduct. *See Colorado v. Connelly,* 479 U.S. 157, 166–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

Whether Orr understood his Miranda rights is a question of fact which underlies the legal question of whether his waiver was knowing and intelligent. *Valdez v. Ward,* 219 F.3d at 1231. This court must therefore presume that the state trial judge's finding that Orr understood his rights was correct unless Orr presents clear and convincing evidence otherwise. *Id.*

Orr does not offer any additional evidence but merely argues that due to his low intelligence or other problems such as "auditory memory problems," he "likely" or "conceivably" did not comprehend the warnings and intelligently waive his rights. After reading the transcript of the suppression hearing and the records of Orr's background, this court agrees with the trial judge that there is no indication that Orr did not understand the Miranda warnings prior to confessing. This court also finds that there is no evidence that coercive tactics were employed by the police officers in obtaining his confession.

The circumstances surrounding Orr's interrogation are gleaned from the record.

After Orr's arrest around 7:00 p.m., he was taken to the office of the administrative sergeant and left there with a police officer outside. Police officers Kelley and Ward, who conducted the interrogation at the police station, testified at the suppression hearing. Both stated that Orr appeared to be asleep in his chair when they entered the room to begin interviewing him around 10:00 p.m. Orr was read his Miranda rights at 10:16 p.m., stated he understood them, and agreed to talk to the officers. Ward and Kelley testified that Orr did not appear to be under the influence and that he responded rationally to questions. Other officers who briefly saw Orr during this time also testified that he did not appear to be under the influence. Orr told them he had smoked "some joints" of marijuana earlier in the day, but said he was not affected that night. Kelley testified that Orr did not exhibit any unusual behavior. Ward testified that Orr seemed very calm and relaxed. Both officers testified that no threats or promises were made to Orr other than Ward saying Orr's friends would be brought in to convince Orr they had told the truth about the incident. Ward also suggested to Orr that he would feel better if he told the truth. Orr was offered food and drink several times. Both officers were wearing holstered weapons during the interview. Orr was not handcuffed.

About one hour into the interview, Orr said he wanted to call his parents. Officer Kelley had in her written report that Orr was a senior in high school. Officer Ward told him he could do that after they were done. Orr asked to call his parents a second time after he had confessed orally and in writing and the interview was over. Orr never asked that the interview be terminated or that he have a lawyer present.

During the first half of the interview, Orr repeatedly stated that he and his friends had not shot anyone. Ward asked Orr if he would take a polygraph exam. Orr responded that he would, but not at that time without his parents and a lawyer present. Officer Ward testified that he explained the felony murder rule to Orr because he did not understand the charges and the Hard 40 sentence because Orr did not appear to be taking the matter seriously. At one point Ward raised his voice after Orr had.

Around 11:00 p.m., Officer Ward learned that the other boys in custody had admitted their involvement and stated that Orr had pulled the trigger. Ward relayed this information to Orr who agreed to tell the truth if his friends were brought in. A little after midnight, Orr's friends were brought one by one into the interview room. Orr then confessed by recounting the events that had transpired in chronological order. The officers testified that the interview lasted approximately four to four and one-half hours including around five breaks of five to fifteen minutes each. After the interview was over and Orr signed his written statement, he pushed the papers aside, lay his head on the desk and fell asleep.

Defendant presented no witnesses at the suppression hearing. The judge took the matter under advisement stating that his only concern was the refusal of Orr's request to call his parents. In his Memorandum Decision denying suppression, the trial judge found the facts to be as testified to by the police officers, and made several specific findings including that Orr was one month short of being 18 at the time of the offense; that the interview started around 10:10 p.m. and lasted around four to four and one-half hours; that the Miranda warnings were read to Orr who stated he understood them and agreed to talk to the officers; and that Orr was "no stranger to police practices." He further found that Ward's raising his voice once, explaining the charges and possible penalties, and the officers' wearing weapons did not amount to coercion or use of force. The judge also opined that when a minor requests to call his parents, the better police practice would be to permit the call, but that such a request did not per se constitute an assertion of a right against self-incrimination. The judge noted that Orr did not otherwise indicate he wanted the interrogation to cease or to consult an attorney. The trial judge stated he viewed the request as one of the totality of circumstances he was to consider, and concluded that Orr's statements were freely and voluntarily given.

The Kansas Supreme Court cited and applied the totality of circumstances test on the basis of established state precedent as well as *Michael C. Orr*, 262 Kan. at 343, 940 P.2d 42. They held that the "evidence relied upon by the trial court and the record ... demonstrate that the trial court's decision under the totality of the circumstances is supported by substantial evidence." *Id.* at 344, 940 P.2d 42. The facts recited herein clearly support the state court's adjudication. Orr does not show that this adjudication was contrary to, or an unreasonable application of established Supreme Court law, or based upon an unreasonable determination of the facts.

In sum, the record supports the Kansas Supreme Court's determination that Orr's defense counsel was not ineffective in that he reasonably investigated Orr's background but found little, if any, evidence to support an insanity or incapacity defense; and that Orr understood his rights under Miranda and voluntarily confessed.

For all the foregoing reasons, this court finds that Orr is not entitled to federal habeas corpus relief.

IT IS THEREFORE ORDERED that this action is dismissed and all relief denied.